## WILLIAM S. HEARD, Exr., v. SARAH D. GARRÈTT.

1. CONTRACT: CONSTRUCTION OF: WHEN A CLAUSE IS REPUGNANT.—If a clause in a written agreement be obviously repugnant to the remaining provisions, such a construction of the whole must be adopted, as is most consonant with the general spirit and objects of the instrument, to be collected from all its parts ; and if such clause be doubtful, it must be reconciled with and explained by plain provisions in other parts of the instrument, and made to yield to the general intent clearly manifested.

2. SAME.—That construction of a written instrument conveying property, which leaves the title to the property in abeyance for any length of time, will not be adopted.

3. SAME : CASE IN JUDGMENT.—The father and his daughter and her future husband entered into an antenuptial agreement, which, after reciting "that the father, being desirous of making a suitable provision for his daughter on her marriage, and to secure the same to her and her heirs," stipulated "that he agreed to deliver to his daughter, upon her marriage, as her marriage portion," certain slaves ; and further, that the future husband and wife, "being desirous to reserve said property to the heirs of the" wife, "if any, and to prevent the same from being sold, or otherwise disposed of during her natural life, agreed with themselves and" the father "that the said slaves, so soon as they should be delivered to the said" husband "after the marriage, shall be and remain in possession of the said" husband and wife "for and during the natural life of the" wife ; "and that the income from the labor of the slaves shall accrue to the" husband "during the natural life of the" wife, "to be disposed of in such manner as he may in his discretion think proper," and that all the estate acquired by such income "shall be the absôlute property of the husband and his heirs forever; and if the" husband "should die leaving issue alive by the" wife, the said slaves "shall descend to and become the absolute property, in fee simple, of such issue; unless the said" wife "should have issue by some subsequent marriage, and in that case all the issue should take share and share alike, at the death of the said" wife. "But in case the said" wife "should die without issue then alive," then on her death "the said slaves shall revert" to the donor "and his heirs forever." After the marriage was solemnized, the husband died leaving issue of the marriage and his wife surviving, and one of the slaves was seized under execution to satisfy a debt of the husband. *Held,* per Handy, J., and Fisher, J., that the instrument vested an estate in the slaves in the wife for her life, which the husband might enjoy for his life ; that upon his death his interest was determined, and the estate vested *in interest* in the children of the marriage, together with the issue of the wife by any subsequent marriage, living at the time of her death, but not to vest in possession until the death of their mother. Per Smith, C. J., upon the death of the husband, who had only a life interest in it, the property descended to the children

of the marriage, subject to the equal right of participation, reserved to the children of the wife by a future marriage.

In error from the Circuit Court of Madison county. Hon. E. G. Henry, judge.

In June, 1855, W. S. Heard, as executor of Jesse Heard, recovered a judgment against Lawson and Davis, administrators of Lewis M. Garrett, deceased, for $301 67, upon a debt created by the intestate in his lifetime. On the 2d day of April, 1856, a *fieri facias* issued upon this judgment, and was levied on a certain slave named Bob, which slave was claimed by Mrs. Sarah D. Garrett, the widow of Lewis M., and she gave bond and security, as required by law, to try the rights of property in the same.

At the return term of the *fieri facias*, the plaintiff in execution tendered the following issue: "And the said plaintiff states that the slave Bob was the property of said Lewis M. Garrett, deceased, during the lifetime of said Sarah D. Garrett; that said Sarah D. is still living, and that said slave is subject to said execution."

And the claimant traversed the issue so tendered as follows:—

"And the said claimant comes and says, that the said negro man Bob was not subject to levy and sale under plaintiff's execution, at the time of the levy thereon, as the property of the said Lewis M. Garrett, deceased."

Upon the trial of the issue, the plaintiff read in evidence the record of the judgment aforesaid, and the *fieri facias*, and return thereon, and proved by a witness, who was the son of L. M. Garrett and the claimant, that said Lewis M. Garrett died on the 6th day of June, 1850, and that before and up to the time of his said death, the slave Bob was in his possession and under his control, and that since the death of said Lewis M. the slave has been in possession of the claimant, and that at the time of the levy he was worth $9000.

The claimant then read in evidence the following instrument:—

"This indenture, made this 15th day of July, in the year of our Lord one thousand eight hundred and twenty-nine, between Hiram Singleton, of the county of Wilkinson, and State of Mississippi, of the first part, Sarah Singleton, daughter of said Hiram, of same

county and State, of the second part, and Lewis M. Garrett, of the third part, witnesseth, That, whereas, a marriage is shortly to take place between said Lewis M. Garrett and said Sarah Singleton; and the said Hiram Singleton, being desirous of making a suitable provision for his said daughter Sarah, on her intermarriage as aforesaid, and to secure the same to her and her heirs, doth hereby agree to deliver to the said Sarah, on her intermarriage as aforesaid, and as her marriage portion, the following negro slaves, to wit: (Here follows the names and description of the slaves, including the one in controversy.)   And the said Sarah Singleton, and Lewis M. Garrett, being desirous of securing said property to the heirs of said Sarah, if any, and to prevent the same from being sold, or otherwise disposed of, during her natural life, do hereby, in consideration of the marriage which is about to take place between the said Sarah and said Lewis M., agree, between themselves and to and with the said Hiram Singleton, of the first part, that the said negro slaves, above mentioned, and their increase, so soon as the same may be delivered to the said Lewis M. Garrett, after his intermarriage as aforesaid, shall be and remain, in the quiet and peaceable possession of the said Lewis M. Garrett and the said Sarah Singleton after their intermarriage, for and during the natural life of said Sarah.   And it is agreed on, between the parties aforesaid, that the income from the labor of said slaves and their increase, shall accrue to the said Lewis M. Garrett, for and during the natural life of said Sarah, to be disposed of in such manner as he, in his discretion, may think proper.   And that all the estate, real and personal, which may be acquired by the said Lewis M. Garrett, from the income of the labor of the said slaves, shall be and remain the absolute property of said Lewis M. Garrett, his heirs and assigns, forever.   And it is further agreed on, between the said parties, that, in case said Lewis M. Garrett should die, leaving issue alive by the said Sarah Singleton, then the negro slaves aforesaid, and their increase, shall descend to and become the absolute property, in fee simple, of such issue, unless the said Sarah should have issue by some subsequent marriage; and, in that case, all the issue shall take share and share alike at the death of said Sarah. But, in case said Sarah should depart this life without issue living, as aforesaid, either by her intermarriage with the said Lewis M.

Garrett, or by some subsequent marriage, then, and in that case, the above-mentioned negro slaves, and their increase, shall, on the death of said Sarah Singleton without issue, as aforesaid, revert to and become the absolute property, in fee simple, of the said Hiram Singleton, and his heirs, forever."

This instrument was duly executed by the parties, and recorded in the register's office of Wilkinson county. Soon afterwards, Garrett and Sarah Singleton intermarried, and the slaves mentioned in the deed, including the one in controversy, were delivered in pursuance of the provisions thereof.

Other proof, in relation to the insolvency of Lewis M. Garrett, and the notoriety of Mrs. Garrett's claim to the slaves, was also introduced, but, under the view taken by the court, it is unnecessary to set it out.

The court, in effect, instructed the jury that, by the terms of the above instrument, all the right and interest of Garrett in the slaves thereby conveyed, ceased and determined at his death.

The claimant (Mrs. Garrett) had verdict and judgment, and thereupon the plaintiff sued out this writ of error.

*Fulton Anderson* and *W. S. Yerger,* for plaintiff in error.

I think there can be no doubt, in this case, that Lewis M. Garrett had an estate for the life of Mrs. Garrett, at least in the property levied on.

The deed itself provides that he should have the absolute use and ownership of the property, during her life, or at least of the income and profits. This provision of the deed did not, however, in any respect, enlarge his rights, and was simply a reservation to him of what the law gave him. The law, in fact, gave him none, as I will show, and his rights were not restrained, unless the supposed limitation to the heirs restrained them, which, on the contrary, as I think, clearly had the effect to enlarge the estate of the wife to a fee, and therefore to vest the fee in him by virtue of his marital rights. If, then, he had no more than the life estate, it was clearly a legal estate, and was subject to the execution. *Day & Prentiss* v. *Cochran,* 24 Miss. R. 261; *Rogers* v. *Pressley,* Ib. 521.

It is clear, at least, that the deed did not intend to reduce the

husband's right below an estate for the life of his wife, and therefore the, instructions granted were erroneous.

But, however this may be, the deed was a conveyance to a woman for life, with remainder to her issue, whether by *Garrett or some subsequent husband,* and the object is declared to be to secure the estate *to the heirs of her body.* Such a limitation, to the heirs of her body, or issue of her body (which, in this deed, is used as synonymous with heirs of her body), whether by Garrett or some subsequent husband, by the operation of the rule in Shelley's case, vested an estate in fee in the first taker. But that fee was not a separate estate in the wife, since there is nothing in the language or purport of the instrument tending to show, that a separate estate for her sole and separate use was intended to be created. In the absence of such intention manifested by language sufficient for the purpose, whatever estate was granted to her vested of course in Garrett. If she took a fee, it was vested in him.

The object is declared in the deed to be, to make a suitable provision for Sarah, on her intermarriage, and to *secure the same* to her and her *heirs,* and therefore the grantor agrees to deliver to her, on her intermarriage, the slaves in question. She and her husband contract with themselves and the grantor, that her husband shall take possession and receive the profits during her life, and after her death the property is to go to her issue, that is, heirs of her body. There is no conveyance to the husband: the conveyance is to the wife; the stipulations, that he should take possession and receive the profits, made no change in the character of the interest he would have taken, for the law gave him precisely what the deed gave him, supposing that the wife's estate was a life estate. The stipulations, therefore, in reference to the husband's interest and in favor of the issue, were simply a prescription of the *method* or *mode* in which the purpose of the deed was to be effectuated, that is, to create an estate for life in the wife, which would of course vest in the husband, with *remainder to the heirs of her body.* But, as such intention, if it be to make the heirs *purchasers,* is contrary to law, as in their character of heirs they cannot by law take as purchasers, the true effect of the instrument was to convey the fee to the wife, which, on the marriage, of course vested in the husband.

The rule in Shelley's case has been so often discussed, and is so

well understood by this court, that I need not refer to authorities on the question of its application upon the limitation in this case. I refer to *Renick* v. *Carroll*, 7 S. & M. 798, where such a limitation was held to vest the title in the first taker. *Polk* v. *Farish*, 9 Yerger, 207. These were Tennessee cases, but the authority has been recognized in this court. *Kirby* v. *Calhoun*, 8 S. & M. 470.

Whether a limitation, even after such a limitation as the above, would be valid, is not here the question as in *Kirby* v. *Calhoun*. It certainly would not be, since, as the fee was vested in the first taker, no subsequent limitation would be valid, except by way of executory devise, or of shifting or springing uses. In *executed marriage agreements* like this, no such limitation ever would be *valid;* or, in other words, the whole estate vests in the first taker. *Renick* v. *Carroll*, 7 S. & M. 798. See also *Jordan* v. *Roach*, 3 George Miss. 481.

That no separate estate was conveyed to the wife, but that all such estate as she took vested in the husband, is clear. The marital rights of the husband to the property of the wife, cannot be defeated unless an intention be *clearly expressed* that the property is to be held for the separate use of the wife. *Williams* v. *Claiborne*, 7 S. & M. 488; *Taylor* v. *Stone*, 13 S. & M. 652; *Grand Gulf Bank* v. *Barnes*, 2 S. & M. 168; *Beaty* v. *Smith*, Ib. 567.

*H. A. H. Lawson*, for defendant in error.

By the terms of the deed of marriage settlement, Lewis M. Garrett and Sarah D. Singleton are to have the quiet and peaceable possession of the slaves therein mentioned during the natural life of said Sarah. The profits of their labor, or income, to be the property of said Lewis M., with the right to dispose of it at his own pleasure; and, at his death, the slaves, and their increase, to descend to the issue of said marriage, unless said Sarah should have issue by some subsequent marriage, and, in that event, all the issue living, at the time of her death, to take share and share alike:

1. Garrett only had the right to the labor, whilst the legal estate was in the donor, Hiram Singleton.

2. The estate taken by Lewis M. Garrett is different from that given to the issue by deed. His estate is a mere equity; there is a fee simple.

3. The word issue is not used as a denomination, or class of per-

sons, to take in succession, and to whom the inheritance is limited in their character as heirs. It is impossible for the issue of Mrs. Garrett, by a subsequent marriage, to take as heirs of Lewis M. Garrett. Unless they can take as his heirs, then, the fee simple, or inheritance, is not limited to them in that character. *All her issue, living at her death, take share and share alike.* The word issue, in marriage articles, is generally a word of purchase.

The limitation to Hiram Singleton was not too remote, for all the limitations were to take effect in the lifetime of persons then in being, to wit, at the time of the death of Sarah Singleton.

We think, then, the limitation was good under our statute, and that the rule in Shelley's case has no application. The rule has been so thoroughly examined by this court, of late, that we do not deem it necessary to call the attention to the decided cases, with which the court is so well acquainted.

"A provision for the issue of the marriage, being one of the principal objects of such agreements, the intention of the parties, however untechnically expressed, must be to make such a settlement as shall contain an effectual provision for that issue, who are generally purchasers for a valuable consideration, and whose rights ought to be protected." 4 Cruise, Digest, 335, § 32.

On the death of Lewis M. Garrett, Sarah Singleton's right to the possession of the slaves did not determine, but her right continued until such time as she may die. The covenant is, that they shall remain in the possession of said Lewis M. Garrett and the said Sarah Singleton after their intermarriage, for and during the natural life of said Sarah.

Then they had a quiet possession, to continue during their joint lives, or, at least, for the life of said Sarah. The death of Lewis M. Garrett did not affect Sarah Singleton's right to retain possession during her natural life. The object of the deed was to provide for herself and issue. This was the manifest intent of the donor, Hiram Singleton. This object could not be accomplished without holding that Sarah Singleton's right to the possession continued so long as she lived, notwithstanding the death of her husband; otherwise she would have been unprovided for by the deed after the death of her husband, when the very object is to secure a provision for her after her marriage.

The conclusion we have come to as to the estate taken by Lewis M. Garrett under the deed is this :—

That he and Sarah Singleton had jointly the quiet and peaceable possession of the slaves, mentioned in the deed, during the lifetime of Col. Garrett, with the right to the profits of their labor, to him in fee, and the increase of the slaves, during his life, with the right to said Sarah, after the death of her husband, to retain the possession, for her own support after his death, during her natural life.

Lewis M. Garrett's estate ended with his life, and the fee simple then vested in the issue of himself and said Sarah, subject to have the interest in that fee simple estate lessened to each of said issue by the subsequent marriage of said Sarah, and the birth of other issue living at her death. The provision being that at her death the issue, in the event of a subsequent marriage, should take the slaves, with their increase, *share and share alike.*

Said Sarah's estate continued after the death of her husband, and she then had the sole right of possession by survivorship. *Sale* v. *Sanders,* 24 Miss. R. 24.

If this position be correct, that Lewis M. Garrett's interest in the slaves ended with his death, then there is no pretence that the slave in controversy was subject to execution against his representatives.

If we be mistaken in this view, and mistaken in the position, that Sarah D. Garrett had the joint right of said Lewis and herself by survivorship, the question still arises, supposing the husband's rights to the profits to continue during the life of said Sarah, had he such an interest in the slave as was subject to seizure and sale under the execution at law ?

The deed gives himself and wife the right to a joint possession, and gives to him the usufruct. He then had precisely the same right to this property that a husband has to his wife's property under the law of 1839,—the right to control it, and take the profits to his own use.

Under that law, it has been held, that the husband could not, by his own bill of sale, sell his interest in his wife's slave, so as to prevent her from recovering the possession, by suit in equity, from the husband's vendee. *Wells* v. *Treadwell,* 28 Miss. R. 717.

If the husband could not sell his interest, which is the profits and the right of controlling during his life, then it would seem to follow, that he had no such interest as was the subject of sale under. execution. An equity cannot be sold under execution. 4 S. & M. 153, and authorities cited.

Parties are permitted to contract away any rights they may have, provided it does not violate any law or the public policy. We always gather the intention of the parties from the contract itself, if it be in writing, and courts generally try to enforce it according to the true intent and meaning of the parties. Marriage settlements are to receive the same construction as other contracts; that . is, to effectuate the intention of the contracting parties. The intention of the contracting parties, it is evident, was to provide for Sarah D. Singleton and her issue, not for Lewis M. Garrett. If he died first, the fee was to vest in the issue of the marriage, subject to the quantity of each one being lessened by another marriage of said Sarah, and other issue living at the time of her death. If she survived, the possession to remain with her until her death, and the issue not to take possession until then, and at that time to take share and share alike.

The fee belonged to the issue the very moment Lewis M. Garrett died, not only in the slaves mentioned in the marriage contract, but also the increase.

It is said the failure to record the deed of marriage settlement subjects the property to the payment of creditors, because they gave credit on the faith of the property in possession of Lewis M. Garrett. The judgment was rendered some four or five years after the deed recorded in this county. Some portion of the claim sued on was contracted before the deed recorded here. But for years before any portion of the debt was contracted, it was generally reputed and known in the community that the property was not the property of Lewis .M. Garrett, but belonged to his wife and her children. Hence no credit was ever given on the faith of this property.

The creditor was not known in law to be such until he had recovered his judgment; then the deed had been on record some four or five years.

Mrs. Garrett recorded the deed very shortly after the death of her husband. She had no power to do so before she became a

feme sole. The husband's rights might have been affected by his own omission, but he could not thereby destroy his wife's rights. The issue could not record. They were all minors until the day it was recorded. No laches will be imputed to femes covert and infants.

The statute was designed to protect the creditor against the person out of possession, yet claiming under the deed.

Here the person to whose debts the property is sought to be subjected, was in possession. His interest ceased with his death; if not, he had no such interest as could be sold under execution. His interest was but an equity: the mere right to the profits of the slaves.

Lewis M. Garrett died in 1850. Mrs. Garrett had possession of said slaves, claiming them as her own from that time, as against his representatives. About six years thereafter, they are levied on as the property of Lewis M. Garrett. Did she not have a good and perfect title by the Statute of Limitation? Three years will give title against the true owner, and it would seem that the creditor, who has only a right to subject it to the payment of debts, would, for a much stronger reason, also be barred.

It is true there was no instruction asked on this point, but it was raised in the court below, and now very properly arises on the record.

*Franklin Smith*, on same side, filed an elaborate argument, too long for insertion, in which he contended for the propositions stated below, and cited and commented on the authorities there stated.

1. The feé simple interest in the slaves was not vested, by virtue of the rule in Shelley's case, in the first taker. *Carroll* v. *Renich*, 7 S. & M. 799; *Powell* v. *Brandon*, 2 Cushm. 345; *Hampton* v. *Rather*, 1 George Miss. 194; *Kirby* v. *Calhoun*, 8 S. & M. 465; *Rucker* v. *Lambden*, 12 S. & M. 231; *Rail* v. *Dotson*, 14 S. & M. 176; Preston on Est. (marg. pages) 369 to 380; *Pells* v. *Brown*, Cro. Jac. 590; 4 Kent Com. (8th ed.) 289 to 293; 2 Black. Com. 201; 6 Cruise Dig. ch. 14, tit. Devise, §§ 38, 45, 51; *Horne* v. *Lyeth*, 4 Harris & Johns. 433; *Lyles* v. *Diggs*, 6 Ib. 370; *Hockley* v. *Maubry*, 3 Bro. Ch. R. 85; 2 Jarman on Wills (marg. page),

354 to 358; *Loring* v. *Hunter*, 8 Yerg. 30; *Gray* v. *Bridgeforth*, 4 George Miss. R. 312; *Wells* v. *Treadwell*, 6 Cushm. 717.

2. That if Garrett and wife took a joint life estate, it descended, upon his death, to the wife. 4 Kent Com. (8th ed.) 380; 2 Jarman on Wills, 157 a, and notes; *Shaw* v. *Hearsely*, 5 Mass. R. 521; *Sale* v. *Saunders*, 2 Cushm. 35.

3. That Lewis M. Garrett, by the antenuptial contract, took no freehold estate, but a usufruct interest, which perished with him. *Magnac* v. *Thompson*, 7 Pet. 348; *James* v. *Kirk*, 7 Cushm. 211; *Bush* v. *Stamps*, 4 Ib. 467; *Harris* v. *McLaran*, 1 Georg. Miss. 569; *Wall* v. *Wall*, Ib. 99; *Lyon* v. *Knatt*, 4 Cushm. 564; *Garrett* v. *Dabney*, 5 Cushm. 344; *Cameron* v. *Cameron*, 7 Cushm. 113; *Edwards* v. *Harben*, 2 T. R. 595; *Cadogan* v. *Kennett*, Cowper R. 432; *Bunn* v. *Winthrop*, 1 John. Ch. R. 334; *Horne* v. *Gartman*, 1 Branch R. 63; *McCutchen* v. *McCutchen*, 9 Porter R. 650; 2 Greenl. Ev. § 356; Co. Litt. 209 a; *Barber* v. *Fox*, 2 Saunders R. 136; 1 S. & M. Ch. R. 365; 9 Wend. R. 209; 8 S. & M. 512, 519; 9 Ib. 391, 392; 3 Cushm. 185; 12 Johns. R. 548; 1 Vernon R. 464; 2 Ib. 473; 3 Cushm. 250; 5 Ib. 155; *Dorsey* v. *Smithson*, 6 Harris & John. 61; *Nailor* v. *Fisk*, 5 Cushm. 264; *Bobb* v. *Martin*, 14 S. & M. 93; Hill on Trustees, 331; *Dixon & Starkey* v. *Doe ex dem Lacoste*, 7 S. & M. 106; *Walker* v. *Gilbert*, Baily Freem. Ch. R. 98; *Chester* v. *Green*, 5 Humph. R. 34.

HANDY, J., delivered the opinion of the court.

In April, 1855, the plaintiff in error recovered a judgment against the administrators of Lewis M. Garrett, who died intestate, in the year 1850. An execution, issued upon that judgment, was levied upon a certain slave; which was claimed by the defendant in error as her property, under the provisions of the statute upon the subject, and an issue was made up thereupon for the trial of the right of property in the slave. The matter of inquiry was, whether Lewis M. Garrett, or his representatives, had any right, title, or interest in or to the slave, at the time of the levy of the execution. His right and title were derived from a deed of marriage settlement, executed in the year 1829, by one Hiram Singleton, the father of the defendant in error (then Sarah D. Singleton), Lewis M. Garrett, and Sarah D. Singleton, in anticipation of a

marriage thereafter to be solemnized between the said Garrett and Sarah, and which was consummated. This deed is in substance as follows: After reciting the anticipated marriage, and that the said Hiram "being desirous of making a suitable provision for his said daughter on her marriage, and to secure the same to her and her heirs," he agreed "to deliver to the said Sarah on her intermarriage as aforesaid, and as her marriage portion," certain specified slaves, including the one in controversy in this case. It was further stated, that the said Sarah and the said Garrett, "being desirous of securing said property to the heirs of said Sarah, if any, and to prevent the same from being sold or otherwise disposed of during her natural life," in consideration of the contemplated marriage, agreed with themselves and with the said Hiram Singleton, that the said slaves, so soon as the same should be delivered to the said Lewis M. Garrett, after his intermarriage, "shall be and remain in the quiet and peaceable possession of the said Lewis M. Garrett and the said Sarah Singleton after their intermarriage, for and during the natural life of said Sarah. And it is agreed on between the parties aforesaid, that the income from the labor of said slaves and their increase shall accrue to the said Lewis M. Garrett, for and during the natural life of said Sarah, to be disposed of in such manner as he in his discretion may think proper; and that all the estate, real and personal, which may be acquired by the said Lewis M. Garrett from the income of the labor of the said slaves, shall be and remain the absolute property of the said Lewis M. Garrett, his heirs and assigns, forever. And it is further agreed on between the said parties, that in case the said Lewis M. Garrett should die leaving issue alive by the said Sarah Singleton, then the negro slaves aforesaid and their increase shall descend to and become the absolute property, in fee simple, of such issue, unless the said Sarah should have issue by some subsequent marriage, and in that case, all the issue should take, share and share alike, at the death of the said Sarah. But in case the said Sarah should depart this life without issue living as aforesaid, either by her intermarriage with the said Garrett, or by some subsequent marriage, then and in that case, the above mentioned slaves and their increase shall, on the death of the said Sarah, without issue as aforesaid, revert to and become

the absolute property in fee simple of said Hiram Singleton and his heirs, forever."

The slaves, including the one in controversy, were delivered according to the terms of this agreement, and it appears that after the marriage of Garrett and the defendant in error, they remained with them during Garrett's life; and since his death, had been in the possession of his widow, the defendant in error, there being issue of the marriage living at the time of his death.

In the construction of the deed of settlement, the following questions arise upon the facts presented by the record :—

1. Did Mrs. Garrett take any estate under the deed? and if so, what was its character?

2. Did such estate vest in Lewis M. Garrett for the term of Mrs. Garrett's life; or did his interest in the slaves determine at his death?

1. In determining the first question, we must take into consideration the object of the donor in making the settlement, as it may be shown by the face of the instrument, as well as the particular words and clauses respecting the interest given to the daughter, and ascertain, from the whole, whether an intention is apparent to give the daughter an individual interest in the property settled.

The deed declares that the donor, for the purpose "*of making a suitable provision for his daughter* on her marriage, and *to secure the same to her heirs,*" and "to prevent the same from being sold, or otherwise disposed of, *during her natural life,*" agreed to "*deliver to her,* on her marriage, and *as her marriage portion,*" the slaves mentioned, and which was done accordingly after the marriage. These expressions appear to show clearly that the object was to give her the use and benefit of the property during her life, and to secure it to her heirs after her death. And this object appears to be more clearly manifested by the subsequent provisions, that all her issue, either by Garrett or by any subsequent marriage, should take the property, share and share alike, at her death; and that, if she should die without such issue living at the time of her death, the property should, *on her death, revert to the donor.* These limitations appear so clearly to indicate that a life estate in the daughter was intended, that we must conclude that a

life estate in her was created by implication, unless that construction be repugnant to other plain provisions of the instrument.

There is but one clause in the deed which appears to be in opposition to this construction; and that is the provision, that, "in case Lewis M. Garrett should die, leaving issue alive by the said Sarah Singleton, then the slaves shall descend to and become the absolute property, in fee simple, of such issue." This clause, if it stood alone, would be conclusive against the life estate of Mrs. Garrett, and would vest the property, upon the death of Garrett, absolutely in the issue of the marriage then alive. But it must be construed with reference to other provisions of the instrument. If obviously repugnant to other provisions, such a construction of the whole must be adopted as is most in consonance with the general spirit and objects of the instrument, to be collected from all its parts; and, if doubtful, it must be reconciled with, and explained by, plain provisions in other parts of the instrument, and made to yield to the general intent clearly manifested.

It is to be observed, in the first place, that the whole clause referred to, does not plainly and necessarily give the property to the issue of the marriage, *to vest in possession upon the death of Garrett.* For, after making a provision to that effect, it continues, "unless the said Sarah shall have issue by some subsequent marriage, and, in that case, all the issue should take, share and share alike, *at the death of the said Sarah.*" The general words, in the first part of the clause, favoring the idea that the donor intended that the estate should pass to, and vest in, the issue of the marriage, immediately upon the death of Garrett, are qualified by the latter words of the clause, which plainly show that the estate was to vest in possession in the issue of the first marriage, together with the issue of Mrs. Garrett by any subsequent marriage, *at her death,* and who might be then living; and that the estate was to vest in possession, neither in the issue of the first marriage, nor in that of any subsequent one of Mrs. Garrett, until her death, which necessarily implies an estate for life in her. If this be not true, the estate must have been left in one of two conditions upon the death of Garrett, leaving issue of the marriage, and his wife surviving him. It must either remain in abeyance until Mrs. Garrett's death, until which time it cannot vest, because until then it cannot be

ascertained whether it vests in the issue of the first marriage alone, or jointly with the issue of a subsequent marriage, which may be born before her death. This condition of the estate cannot be sanctioned; for it is inconsistent with the nature of such property, and leads to unreasonable and improbable results. Or the estate must have vested in the issue at Garrett's death, subject to a condition subsequent, that, if Mrs. Garrett should have issue by a subsequent marriage, such issue shall become entitled to their shares, equally with those of the former marriage, at her death. But the words employed do not import an estate upon condition subsequent. If an estate was vested in the issue of the first marriage, it was not to be divested by the fact of Mrs. Garrett's dying, leaving issue of a subsequent marriage; and, in order to make a condition subsequent, it must operate upon an estate already created and vested, and render it liable to be defeated by the subsequent contingency. 4 Kent's Com. 130 (8th edit.). Hence, it could not be an estate vested in the issue of the first marriage upon a condition subsequent.

All difficulty in interpreting the clause appears to be removed by the construction, that no estate vested in possession, either in the issue of the first marriage, or in that of a subsequent one, until the determination of Mrs. Garrett's estate for life; and, after that, that the estate vested fully and absolutely in the issue of the first marriage, unless there was then issue by a subsequent marriage, in which event the estate became vested in the issue of both marriages. This construction does no violence to the language of the entire clause, and accords with the purposes of the donor, as declared in the deed, and with its positive provisions; while the contrary construction is irreconcilable with the instrument in both of these points of view.

The principal object of the settlement, was to make provision for her on her marriage, so that the property could not be disposed of or sold during her life; and it was to be held by her and her husband during her life. It is manifest that this object would have been entirely defeated by depriving her of the property on Garrett's death, and transmitting it immediately thereafter to their children. And accordingly its positive provisions are, that in the event of Garrett's death, she surviving, the property, at her death,

should go to their issue alone, or jointly to that issue and the issue of any subsequent marriage; and that if she died leaving no issue, by Garrett or any subsequent husband, living at the time of her death, then it should revert to her father and his heirs. It appears to be impossible to understand these provisions otherwise than as giving an estate for life to Mrs. Garrett, after Garrett's death, by necessary implication.

In order to test this, let us suppose that Garrett had died leaving no issue of the marriage and Mrs. Garrett surviving him, what would have been the condition of the estate? It could not go to the issue of the marriage, for there would be none. And it could not then revert to the father, because by the terms of the deed the reversion was only to take place after her death, leaving no issue either by the first or subsequent marriage. It could not remain in abeyance until her death.

It appears clear, therefore, from the whole spirit and scope of the deed, that an estate for life in Mrs. Garrett was contemplated in the event that she should survive her husband.

2. The next question is, whether Garrett became entitled to the use and benefit of the property during the life of Mrs. Garrett, to continue after his death, she surviving him, or whether his interest determined at his death.

There are but two clauses in the deed giving any countenance to the idea, that the interest of Garrett in the property was intended to continue after his death, and during the life of Mrs. Garrett surviving him. One of these is the clause, that the property should remain in the possession of Garrett and Mrs. Garrett after their marriage, "for and during her natural life." The other is the clause, that " the income from the labor of the slaves shall accrue to Garrett, for and during the natural life of Mrs. Garrett, to be disposed of, as he in his discretion may think proper," and all property acquired by Garrett from the income of the labor of the slaves should be his absolute property.

The first of these clauses gives the joint possession to Garrett and his wife during her life; and the legal effect of this is, that upon his death, the right of possession was in her by suvivorship. 4 Kent Com. 380 (8th edit.).

The second clause, taken alone, would appear to sanction the

view that Garrett was entitled to the use and benefit of the slaves during the life of Mrs. Garrett, though she might survive him. But this construction is not sustained by the language employed in the clause, taken in connection with other parts of the instrument.

One of the main objects of the settlement was to make a suitable provision for Mrs. Garrett; and to that end, an estate for life in the slaves was given to her, as is above shown. It was then provided, that after the marriage the slaves should remain in the possession of Garrett and wife during her life; and then follows the clause giving to Garrett absolutely, the income of the labor of the slaves. After this comes the provision, that in case of his death, the slaves should become the property of the children of the marriage, or those of Mrs. Garrett by any subsequent marriage, at her death.

In view of these provisions and of the language used in the clause under consideration, it appears evident that the clause does not contemplate an interest in Garrett beyond the period of his life, for the following reasons:—

1st. If such a provision had been intended, it would have been unnecessary to specify it in the deed; for the law entitled him, in virtue of his marriage, to all the right and title of his wife to the property. The clause, therefore, is to be considered rather as a restriction of his general legal right, than a useless declaration of such right.

2d. The language of the clause contemplates the receipt and disposition of " the income of the labor of the slaves," by Garrett *during his life.* It gives him such income, " to be disposed of in such manner as in his discretion he may think proper, and that all the estate, real and personal, which may be acquired by him from the income of the labor of said slaves, shall be and remain absolutely his property." This language plainly intends individual acts of Garrett in receiving and disposing of the income at his discretion, and in acquiring property by his own act by means of the income, and cannot apply to any interest in him in the property after his death. The power given him to dispose of the income at his discretion, cannot be understood to enlarge the interest intended by the general sense of the clause, and to extend his interest beyond his life; for that would be directly repugnant to a previous

clause declaring that it was one of the objects of the parties to prevent the slaves from being sold, or otherwise disposed of during Mrs. Garrett's life, and inconsistent with the provision plainly made for Mrs. Garrett during her life and after Garrett's death.

3d. It is manifest that the income of the labor of the slaves is the only interest intended to be given to Garrett. That is expressly given to him, and the expression of that, is the exclusion of any other interest. When, therefore, the deed provides that, in the event of his death, the slaves shall be the absolute property of the issue of the marriage, &c., it must be understood to mean, that all his interest was determined by his death; for he had no estate which could prevent the vesting of the estates of his wife and children except his interest in the income of the labor of the slaves.

If these views be correct, the provision that Garrett should be entitled to the income of the labor of the slaves, "*for and during the natural life of Mrs. Garrett,*" must be understood to have been made upon the idea that Garrett should survive his wife.

Considering all the provisions of the deed, and the language of the clause under consideration, they go to show that an estate for life in Mrs. Garrett was contemplated, which Garrett might enjoy so long as he lived; that upon his death his interest was determined, and the estate vested *in interest* in the children of the marriage, together with the issue of Mrs. Garrett by any subsequent marriage, living at the time of her death, but not to vest *in possession* until the death of Mrs. Garrett, who is entitled to an estate for her life. And this appears to be the just and reasonable construction of the instrument.

It follows, from these views of the case, that Garrett's administrators had no interest in the property which could be taken in execution, and that the judgment for the defendant in error was correct. It must accordingly be affirmed.


FISHER, J., said,

The only important question is, whether the property is liable to the plaintiff's execution; and believing that it is not, I concur in the conclusion of this opinion. I also believe that the opinion is correct as to the other questions therein discussed; but do not desire to commit myself beyond the question first stated.

SMITH, C. J., delivered the following dissenting opinion:—

In my opinion the judgment in this case ought to be affirmed. And thus far agreeing with the majority I should yield a silent concurrence, but for the reason that the construction given to the deed of marriage settlement, which, in my opinion, is erroneous, is in effect a final and conclusive adjudication of the rights of all parties arising under that instrument. I am, hence, compelled to express my dissent to that construction. I shall do so in very few words.

There are only three hypotheses, bearing the slightest resemblance of verity, according to which the construction of the settlement can be fixed. The first is, that a freehold interest in the slaves, vested in Mrs. Garrett, as her separate estate, with a limitation in fee to her issue by Garrett, or any future husband; and that Garrett himself took only the usufruct for his own life, if he died first. The second is, that Garrett and wife took a joint life estate, with remainder for life, to the latter, if she was the survivor; remainder in fee to her issue by Garrett or any future husband. And the third is, that Mrs. Garrett took no interest whatever in virtue of the settlement; but that Garrett acquired a freehold estate for his own life, or that of Mrs. Garrett, with a limitation in fee to her issue by that or any future marriage.

1. It is conceded that there is, at the least, plausibility in the first; and, if admitted to be the true construction, one of two results, in my opinion, must inevitably follow: first, that Mrs. Garrett was tenant in tail by implication; or, second, that she held a freehold estate in the property settled, with a limitation, in fee, to her issue.

In either of these events, I apprehend, there could exist no well-founded doubt that she became vested with the absolute fee in the property. In the first case, in virtue of the statute which converted the fee tail into a fee simple. In the second, the estate, limited to her issue, vested in her under the rule in Shelley's case.

2. If the legal effect of the settlement was to vest a joint life estate in Garrett and wife, with remainder to her for life, remainder, in fee, to her issue (which is the construction adopted), an estate tail, by implication, would be created in them. Beyond all doubt, Mrs. Garrett would be tenant in tail. It would, hence, result that,

by the operation of the statute, and in virtue of his marital rights, Garrett would become the absolute owner of the property; and, for that reason, the judgment would be clearly erroneous.

3. But if Garrett took a separate estate, either for his own life, or that of Mrs. Garrett, with a limitation of the fee to the issue, by that or any future marriage, it is certain that, neither as tenant in tail, by operation of the statute, nor in virtue of the rule in Shelley's case, did he acquire the fee in the property. Possessing only a life estate, and not being tenant in tail, the property, upon his death, by the express provisions of the deed, " descended to, and became the absolute property, in fee simple," of the issue of the marriage living at the time of his death, subject to the equal right of participation reserved to her issue which she might have by any future husband.

And this, in my opinion, is the true legal construction of the settlement. According to this view, Garrett possessed no interest in the property, which, upon his death, vested in his administrator. And, hence, I concur in an affirmance of the judgment.